IN THE SUPREME COURT OF NORTH CAROLINA

No. 21PA25

Filed 14 August 2026

STATE OF NORTH CAROLINA

v.

ALLEN JHALIL WILLIAMS

Appeal pursuant to N.C.G.S. § 7A-31 (2025) from the decision of the Court of Appeals, 297 N.C. App. 512 (2024), reversing the trial court's judgment entered on 1 March 2023 by Judge A. Graham Shirley in Superior Court, Wake County, and remanding for a new trial on voluntary manslaughter and any lesser-included offenses. Heard in the Supreme Court on 17 February 2026.

*Jeff Jackson, Attorney General, by Michael T. Henry, Special Deputy Attorney General, for the State-appellant.*

*Patterson Harkavy LLP, by Narendra K. Ghosh, counsel for defendant-appellee.*

RIGGS, Justice.

The question presented here is whether Mr. Williams was entitled to an instruction under N.C.G.S. § 14-51.2(b), commonly known as the castle doctrine. Upon review, we affirm the Court of Appeals' holding that Mr. Williams was entitled to the castle doctrine instruction and that the trial court's failure to provide the instruction was prejudicial, warranting a new trial. We modify, however, the Court of Appeals majority's interpretation of section 14-51.2(b) and hold that the statute is clear and unambiguous when it comes to the interpretation of the term "occupant"

under these facts.

## I.    Factual and Procedural Background

## A. Factual Background

Allen Jhalil Williams met Miracle Lewis, a woman with whom he had exchanged texts and voice messages via Facebook, for the first time on 1 August 2020, when he arrived at her residence in Raleigh, North Carolina.  Prior to meeting Mr. Williams, Ms. Lewis had been in an eight-month long relationship with the victim, Martin Penny, with whom she remained in contact.  On that date, Mr. Williams and Ms. Lewis spent a short amount of time together on her porch before getting into Mr. Williams's car and driving to a nearby gas station on New Bern Ave.  Then, after driving around for some time longer, Mr. Williams and Ms. Lewis drove back to Ms. Lewis's home and parked on the side of it.  Mr. Penny, who lived within walking distance of Ms. Lewis, arrived shortly thereafter in his brother, Tyrelle Peguese's, white pickup truck, exited from the passenger side of the vehicle, and started walking towards the house, and then, towards Mr. Williams's car.  From there, both Ms. Lewis's and Mr. Williams's recollections of the events differ.

### 1. *Ms. Lewis's testimony*

According to Ms. Lewis, Mr. Penny approached the passenger side of Mr. Williams's car, where she was seated, tapped the glass, and asked Mr. Williams who he was through the window and closed door.  When Mr. Williams did not answer, Mr. Penny opened the passenger side door and asked him again, but Mr. Williams still

did not answer. Then, Mr. Penny, leaning into the car and over Ms. Lewis, proceeded to throw a right-hand punch at Mr. Williams, who was sitting in the driver's seat.

After throwing what Ms. Lewis described as "one" punch, Mr. Penny walked around to the driver's side of the car and Mr. Williams got out of the car. According to Ms. Lewis, only "seconds" had passed between the punch and Mr. Penny being completely outside of the car and walking towards the driver's side. Ms. Lewis also got out of the car but remained on the passenger side. The men, according to Ms. Lewis, were "[m]ore in the middle of the road" as opposed to leaning against the vehicle, and "scuffling" or "wrestling." However, Ms. Lewis also stated that she did not see everything as it all "happened very quickly," or rather, in "seconds." At some point during the fight, Ms. Lewis testified that she heard two or three gunshots but never saw a gun nor did she hear Mr. Williams say anything about a gun. After the gunshots, Ms. Lewis testified that she went over to Mr. Penny, who was stumbling backwards towards the back of her house. She also saw the white truck pull off after the gunshots and Mr. Williams immediately get back into his car and leave.

### 2. *Mr. Williams's testimony*

Mr. Williams testified that before he could respond when Mr. Penny asked him who he was, Mr. Penny began punching the right side of Mr. Williams's face with his fist from the passenger side of the vehicle, and Mr. Williams raised his right hand, "trying to block" the punches. At the same time, Mr. Williams, in trying to evade the punches, reached his left hand outside of the driver's side window to "try to open the

door," because the inside driver's door handle was broken. Initially, Mr. Williams was unable to open the door and continued to "try[ ] to get out of the car and duck[ ] punches" before Mr. Penny stopped punching him.

Mr. Williams testified that the pause in the punches led him to briefly think that Mr. Penny was getting out of Mr. Williams's car. However, when Mr. Williams looked over, he stated that he saw Mr. Penny on the passenger side with a gun in his hand. After seeing the gun, Mr. Williams stopped trying to get out of the car and reached for Mr. Penny's gun from inside the car, while Mr. Penny was still leaning into Mr. Williams's car. Mr. Williams testified that he took the gun from Mr. Penny to defend himself. Once Mr. Williams got the gun from Mr. Penny, he stated that he put the gun in his left hand to keep it away from Mr. Penny and began trying to open the car door with his right hand. Mr. Williams testified that Mr. Penny continued to punch him in the "[b]ack of the head, shoulders, back of the neck," as his back was turned while he was trying to exit the vehicle. After Mr. Williams was able to get the door open, and "fell out [of] the car," Mr. Penny came around the front of the car to where Mr. Williams on the driver side.

Mr. Williams testified that he aimed the gun at Mr. Penny when Mr. Penny got to the "driver's side headlights." According to Mr. Williams, Mr. Penny charged at him despite the gun being raised and aimed at him, but Mr. Williams stated he did not shoot Mr. Penny at this point. A scuffle began again between the two, with Mr. Williams testifying that Mr. Penny was "cursing and yelling" at him while punching

him in the ear, head, and face. Mr. Williams testified that he fired the first shot after he "started hearing ringing" in his ear, had gotten hit in the eye, and feared that Mr. Penny would knock him out and take the gun back.

Mr. Williams testified that Mr. Penny didn't react or respond to being shot "at all" and was continuing to curse at him and punch him. Mr. Williams testified that he shot Mr. Penny a second time "a few seconds later" after he was hit again in the eye. Mr. Williams testified that Mr. Penny continued to scuffle with him and did not let go of him. However, Mr. Williams "ended up breaking free" from Mr. Penny's grip. According to Mr. Williams, Mr. Penny continued to punch, come towards, and curse at Mr. Williams before "[Mr. Penny] stop[ed], stop[ed] talking, grab[ed] his chest, and . . . r[an] towards the dark area towards the back of the house." Not long after, Mr. Williams left.

### 3. *Tyrell Peguese's testimony*

Mr. Penny's older brother and the driver of the white pickup truck, Tyrell Peguese, claimed he saw the entire interaction between Mr. Williams and Mr. Penny. He testified that Mr. Penny approached Mr. Williams's car, opened the passenger side car door, reached in, and shut the door. He also testified that he observed Mr. Penny go around the front of the car and Mr. Williams hop out of the car and "basically start[ ] shooting" at Mr. Penny. According to Mr. Peguese, there was no fight or assault other than the shooting, and Mr. Williams already had a gun in his hand when he got out of the car. Mr. Peguese stated that he heard the gun go off

about three or four times.[1]

## B. Jury Instructions at Trial

Mr. Williams was indicted for first-degree murder and possession of a firearm by a felon. On 20 February 2023, this matter came for a hearing before the trial court. Mr. Williams requested a jury instruction on the castle doctrine. During the charge conference, the trial court concluded it would instruct the jury on self-defense, but not the castle doctrine. The trial court determined that an instruction on the castle doctrine was not appropriate because Mr. Williams was not an "occupant" of his vehicle at the time of the shooting because he had exited his vehicle. In the trial court's instructions, the jury was informed that if Mr. Williams acted in self-defense and used excessive force, he would be guilty of voluntary manslaughter.

On 28 February 2023, the jury found Mr. Williams guilty of voluntary manslaughter. Mr. Williams timely appealed the judgment to the Court of Appeals on 1 March 2023. *State v. Williams*, 297 N.C. App. 512, 513, 517 (2024).

## C. The Court of Appeals Judgment

On appeal, Mr. Williams argued that the trial court reversibly erred in failing to instruct the jury on the castle doctrine theory of self-defense under N.C.G.S. § 14-51.2, and, that, if he was entitled to a castle doctrine instruction, the trial court erred in instructing the jury on the consequences of using excessive force in exercising self-

---

[1] The evidence at trial never clearly established to whom the gun belonged or whether Mr. Penny or Mr. Williams brought the gun to the encounter.

defense. *Williams*, 297 N.C. App. at 519. Mr. Williams also contended that the trial court's denial of his request was prejudicial error. *Id.*

The Court of Appeals majority explained that for Mr. Williams to have been entitled to a castle doctrine instruction, the record must demonstrate: "(1) at the time [Mr. Williams] used lethal force against [Mr.] Penny, he was an 'occupant' of a motor vehicle; and (2) [Mr.] Penny was in the process of unlawfully and forcefully entering, or had unlawfully and forcibly entered, the motor vehicle, and [Mr. Williams] knew or had reason to believe such unlawful and forcible entry was occurring or had occurred." *Williams*, 297 N.C. App. at 522; *see also* N.C.G.S. § 14-51.2(b)(1)–(2).

The Court of Appeals majority concluded that the trial court erred in denying Mr. Williams's request for the castle doctrine instruction. To reach its conclusion, the majority turned to the statutory interpretation of section 14-51.2(b)'s use of "lawful occupant," ultimately determining that the term was "ambiguous and unclear," and that a "lawful occupant, under specific circumstances" includes those no longer within the home, motor vehicle, or workplace. *Williams*, 297 N.C. App. at 525–27. This interpretation, the Court of Appeals reasoned, was consistent with the statute's legislative intent: "the lawful occupant 'of' a home, motor vehicle, or workplace is not bound to become a fugitive from these locations and therefore is not required to flee *or remain* in his home, motor vehicle, or workplace until his assailant is upon him." *Id.* at 527.

The Court of Appeals noted that Mr. Penny, whom Mr. Williams observed to

be armed, had entered Mr. Williams's vehicle via the passenger door and began assaulting him. *Id.* at 528. The Court of Appeals also noted that, as Mr. Penny assaulted him, Mr. Williams was seated in the driver's seat of the vehicle and only exited from his vehicle during Mr. Penny's ongoing attack. *Id.* The Court of Appeals concluded that Mr. Williams was not under any obligation to remain in the vehicle during the assault and Mr. Williams, who exited in response to the assault, exercised deadly force while still under attack when Mr. Penny came around the vehicle over to Mr. Williams. *Id.* at 528–29. Viewing the evidence in the light most favorable to Mr. Williams, the Court of Appeals concluded that Mr. Williams was an occupant of his vehicle when he exercised deadly force, entitling him to the castle doctrine defense. *Id.*; *see also State v. Coley*, 375 N.C. 156, 159 (2020) (providing that evidence is viewed in the light most favorable to defendant in determining whether a defendant has presented competent evidence sufficient to support a self-defense instruction (citing *State v. Moore*, 363 N.C. 793, 796 (2010))). Therefore, the Court of Appeals concluded that the trial court erred in failing to grant Mr. Williams's request for the instruction. *Williams*, 297 N.C. App. at 530.

The Court of Appeals further held that Mr. Williams was "prejudiced by the trial court's error because a person who uses permissible defensive force pursuant to N.C.G.S. § 14-51.2 is justified in using such force and is *immune from civil or criminal liability* for the use of such force." *Id.* at 531 (cleaned up). In other words, it held there was a reasonable possibility a different result would have been reached by

the jury but for the trial court's error. *Id.*

Ultimately, the Court of Appeals concluded that Mr. Williams had demonstrated by competent evidence that he was entitled to the castle doctrine instruction and but for the trial court's error, there was a reasonable possibility that the jury would have reached a different result. *Williams*, 297 N.C. App. at 531. Therefore, the Court of Appeals reversed the trial court's judgment and remanded for a new trial. *Id.* The Court of Appeals did not reach Mr. Williams's remaining argument regarding the trial court's excessive force instruction. *Id.* at 531–32.

Judge Stroud, writing separately, concurred in result only, agreeing that Mr. Williams was an occupant for the purposes of the castle doctrine instruction but rejecting the majority's interpretation of section 14-51.2, a statute which she described as "straightforward." *Id.* at 532–33 (Stroud, J., concurring in result only). Judge Stroud explained that, based on the language of the statute alone, "an 'occupant' of a motor vehicle is a person *inside* a motor vehicle *at the time* of an unlawful and forceful entry of the vehicle by another person." *Id.* (emphasis added). As Judge Stroud viewed it, the statute contemplated three scenarios "which could be described as before, during, and after the unlawful and forceful entry into the motor vehicle by an intruder" in which the lawful occupant of a motor vehicle may use defensive and potentially deadly force: "(1) someone is 'in the process of unlawfully and forcefully entering' the occupant's motor vehicle; (2) someone had already 'unlawfully and forcibly entered' the occupant's motor vehicle; or (3) someone has

'removed or was attempting to remove another against that person's will' from the motor vehicle." *Id.* at 533 (quoting N.C.G.S. § 14-51.2(b)(1)).

Judge Stroud explained that the evidence presented in Mr. Williams's case satisfied the requirements for use of deadly force described in both the second and third scenarios. *Id.* In her analysis, "[f]or the third scenario, the only question is if the 'removal' of the occupant 'against that person's will' must be the physical removal . . . or if the removal could occur because the occupant got out of the car to better protect himself during the attack." *Id.* at 534. Judge Stroud interpreted that the statute "envisions a situation where an occupant may need to use force *outside* the car if he is removed in the course of the attack." *Id.* Judge Stroud further emphasized that whether Mr. Williams lost the presumption under § 14-51.2(b), based on the State's evidence that Mr. Penny discontinued all efforts to enter the car, was a question of fact for the jury because the evidence was in dispute—that is, the jury might not ultimately be persuaded that the attack had been continued. *Id.* at 534– 35. Nonetheless, Judge Stroud concluded that Mr. Williams was an "occupant" of the car, mandating the trial court to give the jury the requested instruction. *Id.* at 535.

The State filed a petition for discretionary review with this Court, seeking review of whether the trial court correctly declined to instruct the jury under section 14.51.2. The State argues that the Court of Appeals erroneously interpreted N.C.G.S. § 14-51.2(b) when it concluded the trial court erred by not giving the requested

instruction the jury because, according to the State, section § 14-51.2(b) did not apply in Mr. Williams's case.

## II.    Standard of Review

We review the decision of the Court of Appeals for any error of law. N.C. R. App. P. 16(a). "To resolve whether a defendant is entitled to a requested instruction, we review de novo whether each element of the defense is supported by the evidence, when taken in the light most favorable to defendant." *State v. Mercer*, 373 N.C. 459, 462 (2020) (holding that the trial court must give the substance of a requested jury instruction if it is correct and supported by the evidence). As for an issue involving statutory interpretation, this Court also employs de novo review. *Phillips*, 386 N.C. at 517. When reviewing an issue de novo, this Court "considers the matter anew and freely substitutes its own judgment for that of the lower courts." *In re McClatchy Co., LLC*, 386 N.C. 77, 85–86 (2024) (quoting *Town of Midland v. Harrell*, 385 N.C. 365, 370 (2023)).

If the trial court erred, appellate reversal and remand for a new trial is appropriate only upon a defendant's demonstration of prejudice, meaning he must show "there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial out of which the appeal arises." N.C.G.S. § 15A-1443(a) (2025); *see also State v. Benner*, 380 N.C. 621, 628 (2022).

## III.    Analysis

## A. The Castle Doctrine Generally

North Carolina's defense of a home, motor vehicle, or workplace statute

provides:

> The lawful occupant of a home, motor vehicle, or workplace
> is presumed to have held a reasonable fear of imminent
> death or serious bodily harm to himself . . . or another when
> using defensive force that is intended or likely to cause
> death or serious bodily harm to another if both of the
> following apply:
>
> (1) The person against whom the defensive force was used
> was in the process of unlawfully and forcefully entering, or
> had unlawfully and forcibly entered, a home, motor vehicle,
> or workplace, or if that person had removed or was
> attempting to remove another against that person's will
> from the home, motor vehicle, or workplace.
>
> (2) The person who uses defensive force knew or had reason
> to believe that an unlawful and forcible entry or unlawful
> and forcible act was occurring or had occurred.

N.C.G.S. § 14-51.2(b).

Subject to narrow exceptions, if the statute is satisfied, lawful occupants of

vehicles may use force, including deadly force, against unlawful intruders, without

being subject to civil or criminal liability. *State v. Allison*, 388 N.C. 664, 670 (2025).

That is because, as we explained in *Phillips*, the statute prescribes a non-rebuttable

presumption that any person who unlawfully and by force enters or attempts to enter

a home, motor vehicle, or workplace is doing so with the intent to commit an unlawful

act involving force or violence. *See Phillips*, 386 N.C. at 524. Turning to the lawful

occupant's state of mind, the lawful occupant of the protected space may know or may

have reason to believe such unlawful entry or attempted entry occurred or is occurring. *Id.* If the lawful occupant ends up using force against the intruder that is intended or likely to cause death or serious bodily injury, the lawful occupant is presumed to have held a reasonable fear of imminent death or serious bodily harm and has no duty to retreat from the intruder. *Id.* The lawful occupant's presumption of "a reasonable fear of imminent death or serious bodily harm to himself or herself or another" is rebuttable under certain circumstances. *See Allison*, 388 N.C. at 671 (quoting N.C.G.S. § 14-51.2(b)). For example, the State can rebut the presumption by showing "[t]he person against whom the defensive force is used (i) has discontinued all efforts to unlawfully and forcefully enter the home, motor vehicle, or workplace and (ii) has exited the home, motor vehicle, or workplace." N.C.G.S. § 14-51.2(c)(5) (2025).

When a defendant asserts the castle doctrine defense at trial, the jury must first determine whether the defendant has satisfied section 14-51.2(b). *Allison*, 388 N.C. at 673. If the jury finds that the defendant has not satisfied the conditions of section 14-51.2(b), the castle doctrine statute does not apply and the jury must instead determine the defendant's culpability under section 14-51.3, the general self-defense statute. *Id.* But if the jury finds that the defendant has satisfied the conditions of section 14-51.2(b), it must then inquire into whether the State has rebutted the presumption of reasonable fear. *Id.* If the jury finds that the State has rebutted the presumption, the jury must then determine whether the defendant's use

of force was proportional. *Id.* "However, if the jury finds that the State failed to rebut the presumption, the defendant *must* be acquitted in accordance with section 14-51.2(e)" and questions about excessive or disproportionate force have no role in the jury's decision-making. *Phillips*, 386 N.C. at 526–27 (explaining that "under the Castle Doctrine, excessive force is impossible unless the State rebuts the Castle Doctrine presumption" (cleaned up)).

## B. Mr. Williams was entitled to the castle doctrine instruction under section 14-51.2(b).

This Court stated that "[i]t is fundamental that a jury . . . be properly instructed on the law." *Allison*, 388 N.C. at 674 (quoting *Phillips*, 386 N.C. at 525). "A defendant entitled to *any* self-defense instruction is entitled to a *complete* self-defense instruction . . . ." *Id.* at 674 (alteration in original) (quoting *Coley*, 375 N.C. at 159–60). "[W]here competent evidence of self-defense is presented at trial, the defendant is entitled to an instruction on this defense, as it is a substantial and essential feature of the case, and the trial judge must give the instruction even absent any specific request by the defendant." *Coley*, 375 N.C. at 159 (quoting *State v. Morgan*, 315 N.C. 626, 643 (1986)). To determine whether a defendant has presented competent evidence sufficient to support a self-defense instruction, this Court takes the evidence as true and considers it in the light most favorable to the defendant. *Id.* Once the defendant has presented such competent evidence, "the court must charge on this aspect even though there is contradictory evidence by the State or discrepancies in defendant's evidence." *Id.* (quoting *State v. Dooley*, 285 N.C. 158,

163 (1974)).

When the evidence presented supports that a defendant qualified for the castle doctrine instruction, a trial court's failure to instruct the jury accordingly amounts to an instructional or "non-constitutional" error. *Phillips*, 386 N.C. at 528. Such error "is prejudicial when there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial out of which the appeal arises." *Id.* (cleaned up).

Put simply, the question here is whether Mr. Williams met the statutory criteria to be entitled to the castle doctrine instruction. The gloss on this question presented by the State is where the occupant effectively "chooses" to get out of the vehicle to better protect himself during the attack, can "removal" of the occupant "against that person's will" (as codified in section 14-51.2(b)(1)) occur?

1. ***The parties disagree over whether Mr. Williams was entitled to the castle doctrine instruction based on whether he was considered an "occupant."***

The State argues that Mr. Williams was no longer an "occupant" when he chose to exit the vehicle. The State also argues, pursuant to N.C.G.S. § 14-51.2(c)(5), that the castle doctrine's presumption did not apply to Mr. Williams because of Mr. Penny's discontinued efforts to enter the vehicle and his exit, which it asserts do not go towards rebutting the presumption but toward the statute's applicability. *See* N.C.G.S. § 14-51.2(c)(5) (providing that the castle doctrine's presumption of fear is rebutted where "[t]he person against whom the defensive force is used (i) has

discontinued all efforts to unlawfully and forcefully enter the home, motor vehicle, or workplace and (ii) has exited the home, motor vehicle, or workplace").

The State also argues that the Court of Appeals' decision wrongly applies an event-based construction of the word "occupant," rather than a place-based construction that, it suggests, is the plain meaning of the statute and rooted in the common law tradition of the castle doctrine. Further, the State submits that Mr. Williams's argument for the meaning of "occupant" would allow the term to "extend[ ] to all former occupants automatically and indefinitely" until a jury finds the State rebutted the presumption.

Mr. Williams argues that he was the lawful occupant of the vehicle because he was inside the vehicle when Mr. Penny forcibly entered it. Furthermore, he argues that Mr. Penny removed him from the vehicle against his will by repeatedly assaulting him. As for the State's argument that he chose to exit the vehicle, Mr. Williams argues that he only exited to escape the physical attack inside of his vehicle. Finally, Mr. Williams argues that the Court of Appeals correctly concluded that whether Mr. Penny had discontinued his efforts to enter his vehicle was necessarily a question for the jury—in other words, it did not go to the statute's applicability. Moreover, Mr. Williams points to conflicting evidence regarding whether Mr. Penny did discontinue all efforts to enter the vehicle because after Mr. Williams exited the vehicle, Mr. Penny went to the driver's side and continued to assault Mr. Williams.

## 2. Mr. Williams was the lawful occupant of his motor vehicle.

Determining whether Mr. Williams was considered an occupant as prescribed under the statute is a matter of statutory construction. "The goal of statutory interpretation is to determine the meaning that the legislature intended upon the statute's enactment." *State v. Rankin*, 371 N.C. 885, 889 (2018); *see also Wilkie v. City of Boiling Spring Lakes*, 370 N.C. 540, 547 (2018). It is this Court's "primary task . . . to ensure that the purpose of the legislature . . . is accomplished." *Elec. Supply Co. v. Swain Elec. Co.*, 328 N.C. 651, 656 (1991). We first look to the plain meaning of the words in the statute itself. *State v. Ward*, 364 N.C. 157, 160 (2010). "[W]here the language of a statute is clear and unambiguous, there is no room for judicial construction and the courts must construe the statute using its plain meaning." *Wilkie*, 370 N.C. at 547 (quoting *In re Est. of Lunsford*, 359 N.C. 382, 391–92 (2005)). Even if a term is not expressly defined, that does not necessarily mean it is unclear and ambiguous. Where a statute does not define a word, the word must be given its common and ordinary meaning. *Lafayette Transp. Serv., Inc. v. County of Robeson*, 283 N.C. 494, 500 (1973); *In re Clayton-Marcus Co.*, 286 N.C. 215, 219 (1974). If the word is defined, however, then the statutory definition controls, "however contrary to the ordinary meaning of the word it may be." *In re Clayton-Marcus Co.*, 286 N.C. at 219.

Looking first to the plain meaning of the statute, section 14-51.2 applies to the "lawful occupant of a home, motor vehicle, or workplace." N.C.G.S. § 14-51.2(b). "Occupant" is not defined within the statute, although the statute defines other

material terms, such as "home," "law enforcement officer," "motor vehicle," and "workplace." N.C.G.S. § 14-51.2(a) (2025). Looking, then, to the ordinary meaning of "occupant," an "occupant" is defined as "[s]omeone who has possessory rights in, or control over, certain property or premises" or "[s]omeone who is rightfully present on certain property or premises—as opposed to *trespasser.*" *Occupant, Black's Law Dictionary* (12th ed. 2024).[2] "Lawful" is defined as "[n]ot contrary to the law" or "permitted or recognized by the law; rightful." *Lawful, Black's Law Dictionary* (12th. ed. 2024). Either definition of occupant would render Mr. Williams a lawful occupant here because he was seated inside of his car when Mr. Penny approached the car and assaulted him.

Further, the plain language of the castle doctrine statute provides it is a place-based immunity from which we can infer who qualifies as an "occupant." There are three circumstances in which defensive and potentially deadly force may be used: when the person against whom the defensive force was used is in the process of unlawfully and forcefully entering the occupant's motor vehicle; (2) had already

---

[2] This Court has defined "occupant" in the context of a Fourth Amendment search by holding that a defendant could be considered the "occupant" of his residence when he was outside "on a wheelchair ramp on the neighboring property," meaning his current occupation inside of the home was not necessary to still be considered a resident. *State v. Tripp*, 381 N.C. 617, 619, 631–32 (2022). Similarly, this Court defined "occupant" as someone in the immediate vicinity of a premise to be searched in the context of officers detaining occupants present during the execution of a search warrant. *State v. Wilson*, 371 N.C. 920, 925 (2018). Both interpretations indicate that an occupant is someone within a certain geographical space. However, as the Court of Appeals recognized with respect to *Tripp*, "occupant" as defined in the context of Fourth Amendment is not necessarily coterminous with the word's use and meaning under the castle doctrine statute.

unlawfully and forcibly entered the occupant's motor vehicle; or (3) has removed or was attempting to remove another against that person's will from the motor vehicle. N.C.G.S. § 14-51.2(b)(1).   Thus, an occupant is a person inside of a motor vehicle before or during an unlawful and forceful intrusion as well as a person who has been removed or is being removed by an intruder.

As Judge Stroud's concurrence pointed out, the statute explicitly references the statute's protection being applicable when the intruder has removed or is removing that person from the vehicle.  *See id.* at 533.  The legislature's express extension of the protection to a lawful occupant even where that occupant may no longer physically be in the vehicle renders the State's definition of "occupant" untenable in light of the entire statute.  The legislature plainly intended the protection of the castle doctrine to extend to a lawful occupant who was being forced to leave, by physical means or fear, the protection of the occupant's vehicle.  The "occupant" does not lose their "lawful occupant" status when the occupant only chooses to leave the safety of his or her vehicle because of the unlawful and forceful actions of the intruder.

Additionally, the legislature in section 14-51.2(f) (2025) delineated that a lawful occupant "within" their home, motor vehicle or workplace does not have a duty to retreat while section 14-51.2(b) states that a lawful occupant "of" the same locations has the presumption of reasonable fear when certain criteria are met.  As noted throughout the decisions of this Court, there is a presumption that the "legislature carefully chose each word used" in the statutes it promulgates.  *N.C. Dep't*

*of Corr. v. N.C. Med. Bd.*, 363 N.C. 189, 201 (2009); *see also Rhyne v. K-Mart Corp.*, 358 N.C. 160, 188 (2004) (stating "this Court does not read segments of a statute in isolation"); *Jackson v. Home Depot U.S.A., Inc.*, 388 N.C. 109, 116 (2025) (citing *Dickson v. Rucho*, 366 N.C. 332, 344 (2013)). The ordinary meaning of "within" indicates "enclosure or containment," "an inner place or area," or "inside." *Within, Merriam-Webster's Collegiate Dictionary* (12th ed. 2026). Conversely, "of" is a function word used to indicate belonging or relationship to the word that follows it, a characteristic or distinctive quality, or as an adjective. *Of, Merriam-Webster's Collegiate Dictionary* (12th ed. 2026). The legislature's choice to use "of" as opposed to "within" in section 14-51.2(b), when paired with the statute's explicit description of a scenario in which one may use defensive force during or after compelled removal from the motor vehicle, makes clear that the legislature intended for the lawful occupant to retain the presumption even when they are physically forced out of the protected area. To conclude otherwise would render the statute's protection illusory if the occupant has no choice but to remove themselves from the motor vehicle to avoid further danger.[3] This is not to say that there are no bounds to what might be

---

[3] While we conclude that the statute is clear and unambiguous, the evolution of the statute confirms our interpretation and points to the legislature's intent to apply a more expansive definition of occupant that is not restrained to the protected location. In 2011, the legislature replaced section 14-51.1 with a more detailed statutory scheme that expanded the castle doctrine to allow defensive force in a home, motor vehicle, or workplace, whereas the repealed statute only applied a lawful occupant "within" a home or dwelling. *Compare* N.C.G.S. § 14-51.1 (repealed 2011) *with* N.C.G.S. § 14-51.2 (2025). *See Phillips*, 386 N.C. at 520; *see also* An Act to Provide When a Person May Use Defensive Force and to Amend

reasonably seen as a forced removal (if, say, Mr. Penny unlawfully intruded into Mr. Williams car but used no force and did not attack Mr. Williams) or that the lawful occupant has license to kill even if he has fled to a substantial distance from his safe vehicle. But those bounds of the statute's protection are not presented by the facts in this case.

Ultimately, we disagree with the conclusion of the majority of the Court of Appeals that the statute was not clear and unambiguous as to the definition of "occupant" but agree with the holding that Mr. Williams was a lawful occupant and entitled to the castle doctrine instruction. The language of the statutory scheme is clear—an "occupant" of a motor vehicle does not lose the protection of the castle doctrine if he was removed or fled from the motor vehicle because of the unlawful and forceful entry.

Thus, based on our statutory interpretation, we hold that Mr. Williams was an occupant under section 14-51.2(b) because the evidence, viewed in light most favorable to Mr. Williams, would show that (1) Mr. Williams was inside his vehicle when Mr. Penny began his attack against him; (2) Mr. Williams exited his vehicle during the attack and only in response to it; (3) Mr. Williams exercised deadly force while standing by his vehicle; and (4) Mr. Williams used such force while Mr. Penny continued to assault him.

---

Various Laws Regarding the Right to Own, Possess, or Carry a Firearm in North Carolina, S.L. 2011-268, § 2, 2011 N.C. Sess. Laws 1002, 1004.

Although the State points to Mr. Penny's exit from Mr. Williams's vehicle, or at least his movement from the passenger side to the driver's side, as a discontinued entry and exit, this evidence as to whether the attack or overall intrusion was discontinued is disputed. *See* N.C.G.S. § 14-51.2(c)(5). According to Mr. Williams, Mr. Penny went around the car to the driver's side where Mr. Williams was and continued to assault him, and these events occurred, at least according to Ms. Lewis's testimony, in a matter of "seconds." Our holding on Mr. Williams's entitlement to a castle doctrine instruction, however, does not mean that the jury must believe Mr. Williams's version of events or that it cannot be satisfied, based on the State's evidence, that Mr. Penny had "discontinued all efforts" to enter Mr. Williams's vehicle. A properly instructed jury may have found that the State established that Mr. Penny discontinued the unlawful and forcible intrusion, but ultimately, Mr. Williams presented sufficient evidence such that he was entitled to the castle doctrine instruction.

**C. The trial court's failure to provide the castle doctrine instruction was prejudicial error.**

If the trial court erred, a new trial is required only if defendant was prejudiced. N.C.G.S. § 15A-1443(a). An error in jury instructions "is prejudicial when there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial out of which the appeal arises." *Phillips*, 386 N.C. at 528 (cleaned up).

Had the jury received the castle doctrine instruction and found that Mr.

Williams was entitled to the presumption of reasonable fear, then the jury would have reached the question of whether the State had rebutted the castle doctrine presumption. *Id.* at 525 (once the jury finds that the defendant is entitled to the presumption, then it must determine whether the State has rebutted the presumption). Here, the jury would have been required to reach a different verdict because it could not take into consideration the proportionality of the force Mr. Williams employed.

Put another way, the reasonable probability of a different outcome is amply established where, as here, even factoring in an intermediate conclusion the jury must reach (that Mr. Williams acted in self-defense), the jury would have been prohibited from convicting Mr. Williams of voluntary manslaughter. The jury was instructed that it could only convict Mr. Williams of voluntary manslaughter if they found he acted in self-defense but used excessive force. However, excessive force, as this Court has explained, is a legal impossibility when the castle doctrine statute applies. *Id.* at 517. The jury found Mr. Williams guilty of voluntary manslaughter following the incomplete instructions, but not guilty on the charges of first or second-degree murder. It seems possible and even logical that, by finding that Mr. Williams acted in self-defense, the jury did not think that Mr. Penny had discontinued his attack. If that is the case, and there is a reasonable probability that there is, then a different outcome would have been near certain when the jury considered whether the use of force was excessive based on the trial court's instructions. Had the jury

been properly instructed under the castle doctrine, the jury could not have considered the proportionality of force at all, *unless* the jury found that the State had rebutted the castle doctrine's presumption by demonstrating that Mr. Penny discontinued his attack. But, as described above, we have already established a reasonable probability that by finding that Mr. Williams acted in self-defense and convicting him of voluntary manslaughter, the jury likely did not believe Mr. Penny had discontinued the attack. Thus, had the jury received the castle doctrine instruction, Mr. Williams may have been acquitted as required under section 14-51.2(e). *See Allison*, 388 N.C. at 679 (holding that erroneous jury instructions probably resulted in conviction rather than acquittal for conduct the legislature, through the castle doctrine statute, deemed "lawful and justified").

We do not suggest or mandate any certain outcome at the new trial: the jury gets to decide whether the State failed to rebut the castle doctrine presumption or whether the defense's theory is the correct version of events. But the question presented before this Court is whether Mr. Williams was entitled to the castle doctrine instruction. We conclude that he was, and the trial court's failure to properly instruct the jury was reversible and prejudicial error. Thus, we affirm the decision of the Court of Appeals.

## IV. Conclusion

We conclude that, based on the plain language of the castle doctrine statute and under the specific circumstances of this case, Mr. Williams was an "occupant" of

his vehicle, thus entitling him to the castle doctrine jury instruction. We therefore affirm the decision of the Court of Appeals, holding that the trial court reversibly erred in denying his request for a statutory castle doctrine instruction and remanding for a new trial on voluntary manslaughter and any lesser included offenses. And we modify the part of the Court of Appeals decision below as it pertains to its interpretation of the statute, holding that our statutory construction proceeds from a conclusion that the statute is not ambiguous in its application here.

MODIFIED AND AFFIRMED.

Justice BERGER dissenting.

"The castle doctrine in North Carolina recognizes that unlawful intruders create an inherently dangerous situation in certain specified circumstances, and lawful occupants are thus given the benefit of the doubt in qualifying use of force scenarios." *State v. Allison*, 388 N.C. 664, 670 (2025). We are asked today whether a man standing in the street is a "lawful occupant" of a motor vehicle under N.C.G.S. § 14-51.2 such that a castle doctrine instruction was appropriate. This is not a close case under the statute's plain language, and I respectfully dissent.

When the language in a "statute is unambiguous, we apply the statute as written." *Wynn v. Frederick*, 385 N.C. 576, 581 (2023) (cleaned up). "It should go without saying that we may not interpret what has no need of interpretation and, when the words [in a statute] have a definite and precise meaning, we cannot go elsewhere in search of conjecture in order to restrict or extend the meaning." *State v. Daw*, 386 N.C. 468, 476 (2024) (cleaned up). We have clearly stated in this context that castle doctrine protections "only apply when the defendant satisfies the specific statutory requirements [of N.C.G.S. § 14-51.2(b)]." *State v. Phillips*, 386 N.C. 513, 525 (2024).

The term occupant, both in common usage and the legal context, means physical presence in an area. *See Occupant, Black's Law Dictionary* (12th ed. 2024) (defining "occupant" as "[s]omeone who is rightfully present on certain property or

premises"). The term "lawful occupant" under the statute therefore means a person who is both physically and lawfully present in a home, motor vehicle, or workplace, and applicability of the statute hinges on the presence in a protected area by one who uses defensive force. *See State v. Copley*, 386 N.C. 111, 122 (2024) ("When a person *inside their dwelling* uses lawful force to fend off another's illicit invasion, *the setting makes all the difference*." (emphasis added)). It does not mean, as the majority contends, a person who merely has "possessory rights" in the property. The General Assembly knows how to distinguish between physical occupancy itself and the *right* to lawfully occupy, and it made this distinction in the castle doctrine statute. *Compare* N.C.G.S. § 14-51.2(b) (2025) ("The lawful occupant of a home, motor vehicle, or workplace . . . .") *with id.* § 14-51.2(c) (2025) ("The presumption set forth in subsection (b) . . . does not apply in any of the following circumstances: (1) The person against whom the defensive force is used *has the right to be in or is a lawful resident of* the home, motor vehicle, or workplace, such as *an owner or lessee . . . .*" (emphasis added)).

Indeed, it is the "special status" of the protected area that "vests its lawful occupants with the right to defend it." *Copley*, 386 N.C. at 122 (cleaned up). "[O]nce inside their castle, an occupant is entitled to the security and safety of its walls." *Id.* at 123. It is axiomatic that the protection does not apply outside of the statutorily prescribed areas, and a person's physical presence in a protected area is key, not that person's theoretical right to occupy the space. A person standing in the street is not

an occupant of a vehicle, just like a person who has stepped off of a plane is no longer a passenger. Prior location or proximity to the vehicle are irrelevant here.[1]

This Court has been very careful in providing necessary clarity to our castle doctrine statute. At least up until now. We have previously said that castle doctrine protections "apply when the defendant satisfies the specific statutory requirements [of N.C.G.S. § 14-51.2(b)]." *Phillips*, 386 N.C. at 525. Chief among these requirements, the doctrine may be invoked only by the lawful occupant of a home, motor vehicle, or workplace. N.C.G.S. § 14-51.2(b).

But the majority now requires us to define occupant as someone who voluntarily exits his vehicle and engages in a confrontation of his own choosing. This creative interpretation extends castle doctrine protections far beyond the plain language of N.C.G.S. § 14-51.2 and injects uncertainty into our jurisprudence. By effectively extending castle doctrine protection to "recent" occupants, courts are left wondering "how recent is recent" and "how close is close." *Thornton v. United States*, 541 U.S. 615, 636 (2004) (Stevens, J. dissenting). Such ambiguity is entirely avoidable by simply applying the statute's plain meaning.

It is uncontroverted that defendant exited his vehicle and stood in the street when he fired two shots at the victim. Defendant was physically outside the vehicle and by definition was not an occupant. The majority's interpretive gymnastics cannot

---

[1] The analysis would differ if defendant's home was at issue, rather than his motor vehicle. A home is statutorily defined to "include its curtilage[.]" N.C.G.S. § 14-51.2(a) (2025). A motor vehicle, by contrast, has no curtilage.

override this crucial fact, and subsection 14-51.2(b) simply does not extend protections to a now-former occupant who voluntarily exited his motor vehicle. Instead, defendant was entitled to, and received, a regular self-defense jury instruction which the jury rejected. The majority's disregard for the unambiguous statutory language impermissibly expands the castle doctrine's applicability, muddies this State's self-defense jurisprudence, and erases the bright lines in the statute that we have worked diligently to clarify.[2]

---

[2] The majority also agrees with the concurring judge below that a lawful occupant need not actually occupy the home, motor vehicle, or workplace at the time defensive force is used because subsection 14-51.2(b) provides that a lawful occupant is afforded the presumption of reasonable fear if, in part, "[t]he person against whom the defensive force was used . . . had removed or was attempting to remove *another* against that person's will from the home, motor vehicle, or workplace." N.C.G.S. § 14-51.2(b)(1) (emphasis added). It is not clear that the term "another" necessarily includes the "lawful occupant." Regardless, this Court need not speak on this question today where there is no evidence defendant was forcibly removed from his vehicle. In fact, it is undisputed that defendant himself opened the driver's side door to exit while Mr. Penny was on the opposite side of the vehicle, and defendant admitted Mr. Penny's attack "didn't hurt that bad."